IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| In the matter of the Complaint of S. D. S. | ) | |
| LUMBER CO. for and on behalf of the Tug | ) | |
| BRUCE M., Barge SDS No. 2 and Barge | ) | Civil Case No. 06-1423-KI |
| SDS No. 6, for the exoneration from or | ) | |
| limitation of liability, | ) | FINDINGS AND CONCLUSIONS |
| | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

Philip R. Lempriere
John D. Kimmerlein
Nicolas J. Vikstrom
Keesal Young & Logan
1301 Fifth Avenue, Suite 1515
Seattle, Washington  98101-2603

Michael E. Haglund
Haglund, Kelley, Horngren, Jones & Wilder, LLP
101 S.W. Main Street, Suite 1800
Portland, Oregon  97204-3226

      Attorneys for S. D. S. Lumber Company

Page 1 - FINDINGS AND CONCLUSIONS

Daniel F. Knox
Noah Jarrett
Hamilton H. Emery
Schwabe, Williamson & Wyatt, P.C.
Pacwest Center
1211 S.W. 5th Avenue, Suite 1900
Portland, Oregon  97204

      Attorneys for American West Steamboat Company, LLC

KING, Judge:

      Plaintiff S.D.S. Lumber Co. ("SDS") brought this admiralty and maritime claim under the

Limitation of Liability Act, 46 U.S.C. §§30501-30512.  American West Steamboat Company,

LLC ("American West") filed a claim arising when its cruise ship, the Empress of the North,

("Empress") ran aground to avoid a collision with a tug boat, the Bruce M, and its tows, two

empty chip barges, all owned by SDS.  SDS seeks exoneration from or limitation of liability.

The action was tried to the court.  The following are my findings of facts and conclusions of law.

## FACTS

      SDS owns the Bruce M, a 65-foot pusher tug, and two chip barges, SDS 2 and SDS 6.

      American West charters the Empress, a stern-wheel cruise ship that carries 200

passengers plus crew.  It is equipped with twin Z Drives, a stern paddlewheel, and a jet bow

thruster, making the Empress a highly maneuverable boat.

      The Empress cruises the Columbia River in the spring and fall.  The Columbia has a

marked navigation channel that is 300-feet wide in the area in question.  Some places outside the

channel are deep enough for the Empress.  In other places, there is shallow water or rocks

immediately outside of the marked navigation channel.

Captain Kevin Bellus, the master of the Bruce M, had worked for SDS for 24 years, with the last 14 years working almost exclusively as a tug captain. He is properly licensed and, at the time of this incident, the US Coast Guard had never taken any action against his license.

Second Mate James Nowlin was at the helm of the Empress at the time of the incident. Nowlin, who was about 40 years old, has a Bachelor of Science degree in marine transportation and has worked on ships since college. Much of his career has been in Alaska but he had worked over 40 weeks on the Columbia by the end of 2005. Before 2005, Nowlin received two letters of warning from the US Coast Guard.

I.    Cascades Grounding

I will describe the grounding of the Cascades because it is relevant to whether SDS had privity and knowledge of the negligence or conditions of unseaworthiness leading to the grounding of the Empress.

On November 21, 2005, Bellus was at the helm of the Bruce M, which was pushing two full chip barges arranged end-to-end in a long flotilla. This is a typical tow for the Bruce M. The Bruce M was downbound on the Columbia. The Shaver tug boat Cascades was upbound with four empty barges. The Cascades proposed to meet the Bruce M port-to-port above the Washougal dolphin and the Bruce M agreed. The Bruce M drifted across the channel prior to reaching the dolphin. Bellus believed that he was positioned to pass on either the starboard or port side but he did not communicate any change in plans to the Cascades. When the Cascades came around the corner and saw the position of the Bruce M, the Cascades' skipper knew that the flotillas could not pass port-to-port. He also believed that if he kept going, the Cascades would

have hit either the Bruce M or a dyke.  The skipper of the Cascades elected to run aground to avoid collision.

Captain Gary Collins, the Marine Superintendent for SDS, talked to Bellus about the Cascades situation the next day.  Collins also spoke to Shaver immediately after the incident but never spoke to the skipper of the Cascades to get his viewpoint and never tried to get the Shaver accident report or the US Coast Guard report.  Collins quickly decided that Bellus did nothing wrong and that the Cascades skipper must have been green and panicked.  The Cascades captain had 14 years with Shaver, something Collins never determined.  Collins sent a memo to all of his captains stating that captains must call all vessels to agree on the intention for passing.  The memo also reminded the captains that the channel in that area would allow passing on the starboard side.

II.    Empress Grounding

On the morning of March 24, 2006, the Empress was downbound on the Columbia River, approaching a series of turns in the Washougal Upper Range and Washougal Lower Range. Nowlin was at the helm.  The Bruce M was upbound at Parker's Landing, pushing the two empty chip barges arranged end-to-end in a long flotilla.  Bellus was at the helm.

Bellus radioed Nowlin and asked for a port-to-port passage.  Nowlin agreed.  Bellus did not ask Nowlin to hold up where the Columbia is wide and deep near Reed Island and Gary Island.

The Empress proceeded to the high side of the range, on the Washington side of the channel, to comply with the passing agreement.  It did not significantly reduce speed.  As the Bruce M turned onto the Washougal Upper Range, a south wind arose causing the flotilla to drift

Page 4 - FINDINGS AND CONCLUSIONS

and block most of the channel. This left no room for the agreed-upon port-to-port passage and created the risk of an imminent collision. Although the flotilla was blocking the channel, Bellus did not call the Empress to warn it of the problem.

To avoid collision with the Bruce M, the Empress reduced speed somewhat and steered outside the channel, where it ran aground on the rocks on the Washington side. Nowlin was afraid that if he slowed the Empress too much he would have lost control.

It is normal for the Bruce M to take up most of the channel when coming between the Washougal Lower and Upper ranges. About three to four minutes passed from when the Bruce M first began getting "out of sorts" until the Empress was forced aground. Many tug boat captains testified that they considered the Washougal Lower Range to be a no-passing zone because of the shallow water immediately outside the channel, the currents, and the effect of the wind. The custom is for the downbound boat to stand off near Reed Island or Gary Island until the upbound boat passes safely.

## DISCUSSION

I.    Fault

The Limitation of Liability Act limits shipowner liability arising from the unseaworthiness of the shipowner's vessel or the negligence of the vessel's crew unless the condition of unseaworthiness or the act of negligence was within the shipowner's "privity or knowledge." The shipowner has the burden of proving that the act or condition was outside its privity or knowledge after the claimant first establishes what act or condition caused the loss.

In re Bowfin M/V, 339 F.3d 1137, 1138 (9th Cir. 2003) (footnotes containing citations omitted).

"The applicable standards of care in a collision case stem from the traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized customs

Page 5 - FINDINGS AND CONCLUSIONS

and uses." <u>Stolt Achievement, Ltd. v. Dredge B.E. Lindholm</u>, 447 F.3d 360, 364 (5th Cir. 2006).

Custom which does not completely contradict a statutory rule of navigation may be used to

support a finding of negligence in collisions at sea. <u>Stevens v. F/V Bonnie Doon</u>, 655 F.2d 206,

208 (9th Cir. 1981). "But mere custom, without more, under the law, is not conclusive. . . .

Negligence, if established, cannot be justified by custom." <u>The Indien</u>, 71 F.2d 752, 759 (9th

Cir. 1934 (internal quotation and citation omitted).

> Under admiralty law, if a ship is in violation of an applicable statutory duty at the time of a collision, there is a presumption that the violation contributed to the accident. <u>The Pennsylvania</u>, 19 Wall. 125, 86 U.S. 125, 136, 22 L. Ed. 148 (1873), <u>overruled on other grounds in</u> <u>United States v. Reliable Transfer Co., Inc.</u>, 421 U.S. 397, 411, 95 S. Ct. 1708, 44 L. Ed.2d 251 (1975). This presumption may be rebutted by a showing that the statutory violation could not reasonably be held to have been a proximate cause of the collision.

<u>Crowley Marine Services v. Maritrans</u>, 447 F.3d 719, 724 (9th Cir. 2006) (internal quotation and

citation omitted).

I have not tried to sort out which master did or did not make security calls at the

appropriate time because I do not think a lack of security calls led to the grounding. The boats

were aware of each other and communicated by radio in plenty of time to avoid the grounding.

The problem is lack of communication in other ways.

> The reason that ship captains have radios, and the reason that passing agreements such as the one entered into by the *Flora* and *Six* are reached, is that it can be difficult and even impossible for a captain to telepathically glean the intentions of another ship on the windy, dark sea. Had Captain Gatsos bothered to radio the *Six* and inform it of his intention to abandon the passing agreement, he could have been certain that the *Six* had 1) heard his transmission and 2) was in accordance. Instead, he left the safety of his crew in the hands of fate and "assumed" that "everybody knew" what he was doing by turning left, straight into the oncoming *Formosa Six*.

The Tokio Marine and Fire Ins. Co., Ltd. v. M/V Flora, 1999 AMC 1569, 1574 (E.D. La. 1999).
"A vessel is entitled to rely on the announced intention of another vessel in regard to a passing, and on the presumption that the other vessel will govern herself accordingly." Id. at 1585.

Many tug boat captains explained the local custom of not passing in the Washougal Lower Range and of having the downbound boat hold up. There was no evidence, however, that this custom went beyond the tug boats even though there are other types of commercial boats on the Columbia. If Bellus wanted the Empress to hold up, he should have specified where the passing was to take place. Likewise, once Bellus realized that he was going to get set across the channel, he should have communicated that information to the Empress. The Empress was maneuverable enough to hold to its side of the channel. The Bruce M often could not and Bellus knew this. Thus, he should have suggested a passing agreement with which the Bruce M could comply. Bellus was skippering the more limited boat.

Bellus is not entirely to blame, however. Based on the testimony of expert Captain Don Timmel, I find that Nowlin did not realize how maneuverable the Empress was due to the Z drives. Once Nowlin saw that the Bruce M was set across the channel, Nowlin could have slowed the Empress and remained stationary without losing control of the boat. This would have allowed the Bruce M to make the corner, opening up the channel for the Empress.

Based on this general analysis, I find that Bellus was negligent by failing to ask the Empress to hold up, by failing to specify the point of passing, and by failing to communicate to the Empress that the Bruce M was going to get set across the channel, once it became clear that was going to happen.

Page 7 - FINDINGS AND CONCLUSIONS

I also find that Nowlin was negligent by failing to take all available steps to maneuver the Empress so that it would avoid both a collision with the Bruce M and the grounding. I also find that Nowlin was negligent by proceeding at a speed which might have necessitated a hard stop, even though he should have known that the two boats would be passing in an area where there was little room outside the channel.

Several Inland Navigational Rules, 33 U.S.C. §§ 2001-2030, were also violated. Bellus violated Rule 7, Risk of Collision, and Rule 34, Maneuvering and Warning Signals. Nowlin violated Rule 6, Safe Speed, and Rule 8, Action to Avoid Collision. These violations are proximate causes of the grounding.

Liability for damages in a maritime collision is allocated among the parties proportionately to the comparative degree of their fault. United States v. Reliable Transfer Co., Inc., 421 U.S. 397, 411, 95 S. Ct. 1708 (1975).

If Bellus had properly set up the pass, the Empress would not have run aground. I conclude that he is the more culpable party and assign 70 percent of the fault to SDS and 30 percent of the fault to American West.

II.    Privity and Knowledge

I now turn to whether SDS had privity and knowledge of the negligence or conditions of unseaworthiness leading to the grounding.

Privity or knowledge "usually implies some degree of culpable participation or neglected duty on the shipowner's part: that, for example, it committed a negligent act, or knew of an unseaworthy condition but failed to remedy it, or through the exercise of reasonable diligence could have prevented the commission of the act or the onset of the condition." Carr v. PMS

Fishing Corp., 181 F.3d 1, 4, (1st Cir. 1999). A shipowner is not denied limitation of liability "for a master's navigational errors at sea when the owner has exercised reasonable care in selecting the master." Petition of Kristie Leigh Enterprises, Inc., 72 F.3d 479, 481 (5th Cir. 1996) (master not incompetent when he was properly licensed with over 30 years of experience and one license suspension for allowing his tow to collide with floodgates because he thought they were open).

The Empress grounding did not occur because of a navigational error. The grounding occurred because Bellus did not use proper procedures to set up a pass that, without an agreement otherwise, would occur in the Washougal Lower Range, a known dangerous area. The Cascades grounding was only five months earlier. It was caused by Bellus not communicating his intent to change from an agreed-upon portside passage to taking a position in mid-channel which would allow passage on either the port or starboard. The problem here is not Bellus' reading of the conditions on the river at the time. The problem is Bellus' lack of communication.

Collins did not adequately investigate the Cascades grounding. He did not talk to the skipper of the Cascades, did not get that skipper's accident report, and did not get the US Coast Guard report. SDS did not have a procedure in place specifying what type of investigation should take place after an accident. Because of the lack of investigation, SDS did not put any training or policy in place concerning how to communicate passing agreements so that all parties know what to expect. This led directly to the grounding of the Empress when Bellus again did not fully communicate everything he assumed the Empress would do.

For these reasons, I conclude that the negligence and unseaworthiness of the Bruce M that caused the grounding of the Empress were within the privity and knowledge of SDS.  Thus, SDS is not entitled to limitation of liability.

III.    Damages

Many of the items of damages are not in dispute.  The parties both agree that repair costs were $1,935,807; salvage costs were $175,540, and out-of-pocket costs were $244,388.  SDS objects to a public relations cost of $11,552 but I find that this was a necessary and reasonable out-of-pocket expense and include it in the damages.  The total of these figures is $2,367,287.

The parties dispute how lost profits should be calculated for the cancelled cruises.  I agree with American West's theory that rebooked passengers displace other passengers, even if the later cruise did not sail at 100 percent capacity.  The cancelled cruises were during the most popular fall sailing season.  Cruise passengers often cancel close to the date of the cruise and the room cannot be resold prior to sailing.  Accordingly, I accept the calculations of American West's expert on the lost profits, with one exception.

American West's damages expert calculated lost profits to be $1,101,276.  I do not understand either sides' expert, however, concerning the passenger airfare that was considered in the lost profits calculation.  Consequently, I do not wish to include the airfare as a component of the lost profits but I do not understand how to adjust the $1,101,276 figure.  As a result, I ask the parties to confer and attempt to submit a proposed form of Judgment.

As a general rule, "prejudgment interest should be awarded in maritime collision cases, subject to a limited exception for 'peculiar' or 'exceptional' circumstances."  City of Milwaukee v. Cement Div., Nat. Gypsum Co., 515 U.S. 189, 195, 115 S. Ct. 2091 (1995).  "[N]either a good

Page 10 - FINDINGS AND CONCLUSIONS

faith dispute over liability nor the existence of mutual fault justifies the denial of prejudgment interest in an admiralty collision case." Id. at 199.  SDS has not argued against an award of prejudgment interest.  Accordingly, I award prejudgment interest from the date of the grounding, March 24, 2006, at the rate described in 28 U.S.C. § 1961.

**CONCLUSION**

Because SDS is not entitled to limitation of liability, it is liable for 70 percent of the damages, in the amounts as explained above, plus prejudgment interest.  I ask the parties to confer concerning the airfare issue and attempt to submit jointly a proposed Judgment.  If they are unable to do so, they should both send me a letter by August 11 explaining their positions.

Dated this _____14th_____ day of July, 2008.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge